**SOMERSET PHARMACEUTICALS, INC., Plaintiff,**

v.

**Donna SHALALA, in her official capacity as Secretary of Health and Human Services; and Dr. David Kessler, in his official capacity as Commissioner of the Food and Drug Administration, Defendants.**

**C.A. No. 96–403–SLR.**

United States District Court, D. Delaware.

June 13, 1997.

---

Lawrence S. Drexler of Oberly, Jennings & Drexler, P.A., Wilmington, DE, for plaintiff; Stephen C. Page, Sheila D. Biehl and Patricia A. Leonard of Gunster, Yoakley, Valdes–Fauli & Stewart, P.A., Stuart, FL, of counsel.

Frank W. Hunger, Assistant Attorney General, Civil Division, Gregory M. Sleet, United States Attorney, Patricia C. Hannigan, Assistant United States Attorney, and Gerald C. Kell, Senior Trial Counsel, Office of Consumer Litigation, United States Department of Justice, for defendant; Margaret Jane Porter, Chief Counsel, Neal Parker, Associate Chief Counsel, and Elizabeth Dickinson, Assistant Chief Counsel, Food and Drug Administration, Rockville, MD, of counsel.

### MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

On August 5, 1996, plaintiff Somerset Pharmaceuticals, Inc. filed a verified complaint for injunctive and declaratory relief and review of agency action, asserting jurisdiction under 28 U.S.C. §§ 1331 and 1361. (D.I.1) Also filed were motions for the issuance of a temporary restraining order and a preliminary injunction, with supporting documentation. (D.I.2–7) Limited discovery was undertaken and by memorandum order issued August 7, 1996, plaintiff's motion for a temporary restraining order was denied. (D.I.21).

Currently pending before the court is plaintiff's motion for a preliminary injunction. (D.I.5) For the reasons stated below, plaintiff's motion will be denied.

## II. SCOPE OF REVIEW

The parties agree that the relevant provision of the Administrative Procedures Act, 5 U.S.C. § 706(2), forbids the court, as a general rule, from undertaking its own fact-finding. Rather, the court must restrict itself to the administrative record assembled by the agency except where the court cannot undertake a meaningful review of the agency's action based on the administrative record alone. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Higgins v. Kelley,* 574 F.2d 789, 792–93 (3d Cir.1978) (holding that relevant, pre-decision materials wrongfully excluded from the record may be considered on review); *Twiggs v. Small Business Administration,* 541 F.2d 150 (3d Cir.1976) (court may not consider extrinsic evidence, *e.g.,* a deposition taken after the agency's decision was made). In discharging its role of limited judicial review, the court's

> focal point ... should be the administrative record already in existence, not some new record made initially in the reviewing court. The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706 to the agency decision based on the record the agency presents to the reviewing court.

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter

being reviewed and to reach its own conclusions based on such an inquiry.

*Horizons Int'l, Inc. v. Baldrige,* 811 F.2d 154, 162 (3d Cir.1987), *citing Camp v. Pitts,* 411 U.S. at 142, 93 S.Ct. at 1244; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Florida Power & Light Co. v. Lorion,* 472 U.S. 1005, 105 S.Ct. 2698, 86 L.Ed.2d 715 (1985).

The reviewing court must have before it the complete administrative record on which the agency acted including "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 739 (10th Cir.1993). *See also Tenneco Oil Co. v. Department of Energy,* 475 F.Supp. 299, 317 (D.Del.1979). While limited discovery may be appropriate in order to determine whether the complete record has been provided to the court,

> the designation of the administrative record, like any established administrative procedure, is entitled to a presumption of administrative regularity ... absent clear evidence to the contrary.

*Id.* at 740. Courts other than the Third Circuit have held that consideration of evidence outside the administrative record may be appropriate under some exceptional circumstances, for instance,

> for background information ... or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.

*Norwich Eaton Pharmaceuticals, Inc. v. Bowen,* 808 F.2d 486, 489 (6th Cir.1987), *quoting Asarco, Inc. v. USEPA,* 616 F.2d 1153, 1160 (9th Cir.1980). *Accord Rybachek v. USEPA,* 904 F.2d 1276, 1296 (9th Cir. 1990).

In the present case, the court has reviewed the materials outside of the administrative record solely for the purpose of determining whether the administrative record is complete. The court finds that the administrative record submitted by defendant provides ample documentation of the agency's decisionmaking process. Of the supplemental materials submitted by plaintiff, the affidavits and other documentation produced after the FDA's decision clearly may not be considered under *Twiggs.* The remainder is either duplicative of the administrative record or unnecessary to evaluate the agency's decision. Effective review will not be frustrated by the absence of these additional materials. Nor has plaintiff supported with any authority its argument that defendants have waived this requirement by presenting affidavits of its own. Therefore, with the exception of those materials providing basic background information (*e.g.,* the nature of Parkinson's symptoms), the court declines to rely upon the materials submitted by either party outside of the administrative record in reaching its decision on the pending motion.

## III. FACTUAL BACKGROUND

On June 5, 1989, the Food and Drug Administration ("FDA") approved plaintiff's new drug application ("NDA") for the drug Selegiline Hydrochloride ("selegiline"), used in conjunction with other drugs for the treatment of patients with late-stage Parkinson's Disease, a degenerative disorder characterized by symptoms such as tremors, muscle rigidity, and the deterioration of gross motor skills. (D.I. 1 at ¶ 15) Because it was the first drug manufacturer to obtain FDA approval for selegiline, plaintiff was granted the right of exclusive sales and marketing of its "Eldepryl" tablets (known as the "pioneer" product) for seven years following the FDA approval, pursuant to 21 U.S.C. § 360, a statute promulgated to encourage research and the development of treatments for certain diseases. (D.I. 1 at ¶¶ 5–6) Plaintiff's exclusivity period for its pioneer product "Eldepryl" expired on June 6, 1996, at which time generic drug manufacturers whose abbreviated new drug applications ("ANDAs") were approved by the FDA could begin marketing and selling generic forms of selegiline. (D.I. 7 at 29–30)

### A. Uses and Properties of Selegiline

Parkinsonism is caused by an insufficiency of dopamine, a neurotransmitter which enables the body to control movement. (D.I. 19 at Ex. M, ¶ 6) Selegiline works by inhibit-

ing monoamine oxidase B ("MAO B"), a chemical that breaks down dopamine and creates in the process a substance that further limits the brain's ability to produce dopamine. (D.I. 19 at Ex. M, ¶ 7) For reasons not yet clear, selegiline selectively interacts with MAO B over MAO A when taken at the proper dosage. This property is significant because MAO A, which exists primarily in the digestive tract, is responsible for eliminating toxins from the body. When MAO A is inhibited, the toxins build up and can cause sudden and severe hypertension. (D.I. 19 at Ex. M, ¶ 11) According to studies cited by Somerset in its submissions to the FDA, doses above 30 mg per day can cause selegiline to lose its selectivity and produce a "hypertensive crisis," also known as the "cheese effect." (A.R. I at Ex. 6)

Selegiline is used in conjunction with another drug called levidopa/carbidopa ("L-dopa"), which has traditionally been the primary treatment for patients with Parkinson's. L-dopa stimulates the production of dopamine. When L-dopa is used alone over time, the patient experiences a "wearing off effect," and needs increasing doses of the drug to produce the same effects. Eventually, the dosage required to mitigate the symptoms of Parkinson's becomes so high as to produce toxic side effects, at which point treatment must be discontinued. (A.R. I at Ex. 6; D.I. 19 at Ex. M, ¶¶ 8, 9) Selegiline, however, by increasing the amount of time that dopamine stays in the brain, slows down the wearing off effect of L-dopa, thus enabling L-dopa therapy to continue longer. (D.I. 19 at Ex. M, ¶ 12)

The body absorbs selegiline readily and rapidly. As a result, it is difficult to detect the existence of the drug in the patient's plasma after a single 10 mg dose, let alone quantify it. (A.R. I at Ex. 6) When "Eldepryl" was approved as a new drug in 1989, it was virtually impossible to detect levels of the parent selegiline compound in the bloodstream from a single 10 mg dose, given the state of the art in bioanalytical techniques at

the time. (A.R. IV at 1) Instead, to measure the pharmacokinetic properties of the drug, researchers measured the metabolites produced by the breakdown of selegiline in the body. The three metabolites of selegiline are N-desmethylselegiline ("DES"), L-methamphetamine ("methamphetamine"), and L-amphetamine (amphetamine). (A.R. I at Ex. 6) Of these, DES is known to have some MAO B-inhibiting properties, but is six times less potent than selegiline itself. (A.R. IV at 1)

## B. New Drug Application for Selegiline Solution

On December 28, 1994, Somerset submitted to the FDA's Division of Neuropharmacological Drug Products ("Neuropharm") an NDA for an oral solution form of selegiline. In its cover letter accompanying the application, Somerset explained that it was pursuing approval of a liquid form of the drug "to provide a more convenient method of administration for an elderly population." (A.R. V at Ex. 1) No other reason or concern was offered for the application.

A sponsor submitting an NDA must normally provide data demonstrating the *in vivo* bioavailability of the drug for which it seeks approval. 21 C.F.R. § 320.21. The FDA may waive this requirement if the sponsor can demonstrate that its product is bioequivalent with an already approved drug. 21 C.F.R. § 320.22.[1] In cases where "the *in vivo* bioavailability of bioequivalence of the drug product may be self-evident," the drug application may be approved without demonstrating either bioavailability or bioequivalence. 21 C.F.R. § 320.22(b). Invoking the "self-evident" provision of the regulation, Somerset sought a waiver of the bioavailability/bioequivalence requirement. (A.R. V at Ex. 1) After a preliminary review, FDA denied the request for a waiver and refused to file the NDA. (A.R. V at Ex. 2) Somerset replied that it had already demonstrated bioequivalence with the tablet form of the drug in a previous study, and asked for leave to amend

1. As defined by the FDA,
 [b]ioequivalence means the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical al-

ternatives becomes available at the site of drug action when administered at the same molar dose under similar circumstances in an appropriately designed study.
21 C.F.R. § 320.1(e).

the NDA to reference that study. (A.R. V at Ex. 3)

On April 12, 1995, Iftekhar Mahmood, Ph.D. submitted his review of this request to the Neuropharm division.[2] He noted that the referenced bioequivalence study measured and compared only metabolites for the tablet and solution formulations. Somerset, however, "[n]ow ... claims to have developed an analytical method which can measure selegiline as low as 0.01 ng/ml." (A.R. V at Ex. 5) Without commenting on the sensitivity or accuracy of the assay, Dr. Mahmood recommended that Somerset use its new analytical method to demonstrate bioequivalence. (A.R. V. at Ex. 5) The record contains no evidence that the FDA requested or received validation data on this "new analytical method." Apparently, Somerset did not pursue its NDA for oral solution selegiline further.

## C. Introduction of Capsule and Withdrawal of Tablet

In August 1995, Somerset submitted to Neuropharm an NDA for a capsule form of Eldepryl. According to the letter accompanying the application, the company had chosen to change the form of the drug to comply with FDA regulations concerning imprinting. The letter stated that "[d]ue to the small size of the presently marketed Eldepryl Tablets it is not possible to emboss the tablets with a distinctive product name and company name and logo." (A.R. II at Ex. 1) The lack of imprinting, Somerset noted, had made the drug easy to counterfeit, and had caused confusion with other, similar-appearing tablets. The capsule, in contrast, was designed to be clearly labelled, difficult to counterfeit, and easy to distinguish from other drugs.

On January 30, 1996, Somerset submitted to the FDA a videotape containing a news report about the widespread counterfeiting of selegiline. The company expressed concern over these "adulterated and misbranded" illegal copies of its product and urged the FDA to expedite consideration of its capsule NDA. (A.R. II at Ex. 2)

The FDA approved the capsule form of Eldepryl on May 15, 1996. In a review of Somerset's NDA, Dr. Mahmood noted that although parent drug levels were not generally measurable in the past "due to the lack of sensitivity in plasma assay," the company "currently uses a validated, LC/MS assay for the determination of selegiline and metabolites in human plasma with a lower limit of quantitation of 10 pg/ml for selegiline. This new assay has permitted the characterization of selegiline plasma pharmacokinetics." (A.R. IV at 1)

In determining the bioequivalence of the capsule to the selegiline tablet, Dr. Mahmood sought a consult with the Division of Biometrics "for verification of the Sponsor's statistical analysis." (A.R. IV at 14) In addition, a meeting was held with representatives from Biometrics, the Office of Clinical Pharmacology and Biopharmaceutics ("OCPB"), including Dr. Mahmood, and the Office of Generic Drugs ("OGD"), including Dr. Henderson, the reviewer who would later declare the parent drug assay invalid. (A.R. IV at 14) At that meeting, "[i]t was concluded that the capsule is bioequivalent to the tablet for **all the four analytes (the parent and the three metabolites.)**" (A.R. IV at 14) (emphasis added). The bioequivalence testing also found that the levels of the three metabolites did not vary as much as parent selegiline levels under certain conditions. For example, while both selegiline and its metabolites accumulated with multiple dosing, "[t]he degree of accumulation was greater for selegiline than its metabolites." (A.R. IV at 4) Similarly, while food increased the mean peak plasma concentrations ("$C_{max}$") of selegiline threefold, the metabolite levels showed no change. (A.R. IV at 7)

Two days after the FDA approved the capsule form of selegiline, Somerset announced its decision to cease production of Eldepryl tablets. The company explained its reasons in a letter to the FDA:

We are undertaking this complete market replacement out of concern for the safety of our patients with Parkinson's Disease

---

**2.** Dr. Mahmood already had some familiarity with attempts to measure parent selegiline levels, due to a Ph.D. thesis he published in 1995. (D.I. 1 at Ex. 14)

(PD). With this action we are attempting to remedy the following problems:

1. Repeated and widespread counterfeiting of Eldepryl Tablets by other companies and illegal introduction of these products into the U.S. marketplace.

2. The ready availability of unsafe and unapproved counterfeit imports purporting to be Eldepryl Tablets.

3. Mix-ups of Eldepryl Tablets by physicians, pharmacists and patients with other similarly appearing drug products.

(A.R. II at Ex. 4) The company reported that there had been several incidents of confusion between Eldepryl and the similar sounding enalapril, also a 5 mg white tablet. (A.R. II at Ex. 1) Somerset requested that the FDA remove the tablet form of the drug from its Approved Drug Products List pursuant to 21 C.F.R. § 314.162.[3] In response to the FDA's withdrawal of the drug from the approved drug list, three other drug companies, all of which had submitted ANDAs for generic selegiline in tablet form, filed citizen petitions requesting that the FDA determine whether the tablet was withdrawn from the market for safety or effectiveness reasons. (A.R. II at Ex. 7–8, 13)[4] These petitions attacked the basis for Somerset's claims that the tablet was withdrawn for safety reasons, arguing that the regulations applied only to the safety or effectiveness of the listed drug itself, rather than to counterfeited versions of the drug. Moreover, the petitions challenged Somerset's assumption that a capsule formulation would be more difficult to counterfeit. Rather, Somerset's competitors suggested that the tablet was removed from the market for purely economic reasons:

> With the recent expiration of exclusivity for its 5 mg tablet, Somerset wishes to defend Eldepryl against competition from generic versions of the tablet by habituating patients and physicians to the capsule

form of the drug. Somerset's withdrawal of its tablet will also delay generic competition by requiring ANDA sponsors to submit, and the Agency to decide, petitions such as this one before generic versions of Eldepryl can be approved.

(A.R. II at Ex. 13) The administrative record contains identical responses from Somerset to the first two of these citizen petitions, reiterating its claim that the tablets were withdrawn for safety reasons. (A.R. II at Ex. 9, 11) In internal e-mail messages dated June 28 and July 9, 1996, an FDA employee, Russell Katz, expressed strong doubts as to Somerset's safety claims. He noted that Somerset had not withdrawn its NDA for the tablets, nor had the FDA. There was no evidence that elderly Parkinson's patients had difficulty swallowing or handling the tablet. Mr. Katz also argued that Somerset's concerns over confusion with other drugs would not necessarily hold true for generic tablets. Since the generics would not be called "Eldepryl," there was less chance for confusion with enalapril. There was also no requirement that generic tablets look like Eldepryl. Generic manufacturers, therefore, could take other measures to avoid confusion with unapproved counterfeit versions. Finally, the claim that the tablet was too small to imprint with a distinctive logo was discredited on the basis that the current imprints fully complied with FDA standards. (A.R. II at Ex. 10, 12)

On July 26, 1996, Janet Woodcock, M.D., submitted a review of the citizen petitions and a draft response to the Director of the Center for Drug Evaluation and Research. (A.R. II at Ex. 14) Dr. Woodcock noted that the presence of counterfeit drugs was not a problem unique to Eldepryl and did not make the product unsafe. Dr. Woodcock concluded that the alleged preference for capsules among elderly patients did not con-

---

**3.** The relevant regulation provides:

FDA will remove a previously approved new drug product from the list for the period stated when ... [t]he agency, in accordance with the procedures in § 314.153(b) or § 314.161, issues a final decision stating that the listed drug was withdrawn from sale for safety or effectiveness reasons, or suspended under § 314.153(b), until the agency determines that

the withdrawal from the market has ceased or is not for safety or effectiveness reasons.

**4.** The FDA may not approve a generic version of a drug which has been removed from the market for safety or effectiveness reasons. 21 U.S.C. § 355(j)(3)(I). Therefore, both Somerset and its competitors had an economic stake in the FDA's decision.

stitute a safety issue, and echoed Mr. Katz's conclusion that the confusion between Eldepryl and enalapril would not occur with differently-named generics. (A.R. II at Ex. 14) On August 9, 1996, the FDA released its final determination, based on the above reasons, that the Eldepryl tablets were not withdrawn for safety or effectiveness reasons, and that the Agency, therefore, would accept ANDAs based on the tablet form of the drug. (A.R. II at Ex. 15)

### D. Approval Process for Generic Selegiline

Near the end of Somerset's exclusive seven-year period, the FDA received three ANDAs for generic versions of selegiline. ANDAs submitted by generic manufacturers need not contain test data proving that their drugs are safe and effective, as an NDA requires. Instead, generic manufacturers are presumed to have safe and effective products if they can demonstrate that their products are bioequivalent to the pioneer product. According to FDA regulations, two drug products will be considered bioequivalent

> if they are pharmaceutical equivalents or pharmaceutical alternatives whose rate and extent of absorption **do not show a significant difference** when administered at the same molar dose of the active moiety under similar experimental conditions, either single dose or multiple dose.

21 C.F.R. § 320.23(b)(emphasis added). The regulations also specify the evidence required to establish bioequivalence:

> Applicants shall conduct ... bioequivalence testing using the most accurate, sensitive, and reproducible approach available among those set forth in paragraph (b) of this section. The method used must be capable of demonstrating ... bioequivalence ... for the product being tested.
>
> (b)(1)(i) An *in vivo* test in humans in which the concentration of the active moiety, and, when, appropriate, its active metabolite(s), in whole blood, plasma, serum,

or other appropriate biological fluid are measured as a function of time....

21 C.F.R. § 320.24.

On September 28, 1995 Somerset contacted the OGD to request a meeting concerning the procedures for establishing bioequivalence. (A.R. I at Ex. 1) According to Somerset, measuring the metabolite levels of the generic drugs and comparing them to those produced by Eldepryl was not sufficient to establish bioequivalence. Rather, it was both important and, due to new testing methods, possible to measure the levels of the parent drug. According to Somerset, recent research had shown that metabolite levels did not fluctuate proportionately to changes in the bioavailability of the parent drug. Somerset included a list of the studies from which it drew its conclusions, and promised to make available the data on which they were based. (A.R. I at Ex. 1)

One of the studies Somerset submitted for the FDA's review noted that levels of the parent drug, as well as metabolites, had been measured in both plasma and urine by use of a highly sensitive method not previously available. (A.R. I at Ex. 6)[5] The study showed that food increased the bioavailability of selegiline while the metabolite levels remained close to constant. The researchers also concluded that selegiline stayed in the body longer and was present in higher concentrations when administered in a two dose regimen, while the dosing schedule had less of art effect on the levels of DES, methamphetamine, or amphetamine. Despite the chemical similarity between selegiline and its metabolite DES, the study found "the use of N-desmethylselegiline as a marker for the bioequivalence of oral selegiline hydrochloride dosage forms problematic and ineffective in identifying a bioinequivalent product." (A.R. I at Ex. 6)

In his review of the study submitted by Somerset, James D. Henderson, Ph.D., of the Division of Bioequivalence, expressed disagreement with Somerset's conclusions, and noted that Somerset had not submitted sufficient validation data to enable the FDA to evaluate the "stability, sensitivity, and preci-

---

**5.** A letter from Somerset accompanying this study noted that it had been submitted, but not

yet accepted, for publication in the *American Journal of Therapeutics.* (A.R. I at Ex. 6)

sion" of the test by which the company claimed to have measured the levels of parent drug. (A.R. I at Ex. 8) The reviewer's report, dated December 20, 1995, criticized Somerset's study for failing to specify which data resulted from *in vivo* tests with humans and whether the *in vitro* or *in vivo* animal tests could be appropriately extrapolated to humans. Referring to Somerset's data tables comparing selegiline and metabolite levels after doses taken with food to those taken without, Dr. Henderson concluded that "[t]he variabilities in the data reported above for selegiline are so large that the data have little value from a regulatory point of view." (A.R. I at Ex. 8) Dr. Henderson recommended that bioequivalence be determined by measuring metabolites, due to the variability of the selegiline levels measured in Somerset's study and the lack of information on the method used to measure the parent drug. He also concluded that single dose rather than multiple dose comparisons should be required because the former provided a more stringent test of bioequivalency. (A.R. I at Ex. 8) .

On December 22, 1995 the FDA issued its final version of a guidance for selegiline bioequivalence testing which incorporated Dr. Henderson's recommendations. Regarding the measurement of the parent drug as recommended by Somerset, the guidance indicated that the levels of selegiline should be assayed and reported. The guidance did not, however, require a statistical analysis of selegiline levels as it did for metabolite levels. The guidance was approved by Dr. Henderson as well as the Director of the Division of Bioequivalence, a Branch Chief, and a Deputy Director for Pharmaceutical Science at the Center for Drug Evaluation and Research. (A.R. I at Ex. 9)

Somerset, through counsel, promptly requested that the FDA either withdraw the guidance or hold it in abeyance pending further investigation of Somerset's data. (A.R. I at Ex. 11) Another letter, from Leslie Z. Benet, Ph.D., a professor at the University of California at San Francisco and a consultant for Somerset, pointed out the high variability of selegiline levels and noted that one of the FDA's own scientists had done a study con-

cluding that, in one instance, variations in levels of the parent drug were not reflected in the metabolite levels. Dr. Benet urged the FDA to reconsider its guidance. (A.R. I at Ex. 14)

There followed a series of internal communications and meetings among FDA scientists in both OGD and the New Drug Division ("NDD") concerning the issue of selegiline bioequivalence (A.R. I at Ex. 15–17, 22–23, 29–30, 32, 34–38), and letters between Somerset and the FDA. (A.R. I at Ex. 18–21, 24–28, 31, 33, 39) FDA scientists discussed the fact that NDD had previously found a parent selegiline assay to be validated on the basis of data submitted by Somerset. (A.R. I at Ex. 20) Also mentioned was the fact that FDA had approved a site change for the manufacturing of Eldepryl several years previous, and had determined bioequivalence based solely on metabolite levels. (A.R. I at Ex. 23) The site change raised some difficult questions, as noted by Charles Ganley in an e-mail message to several other FDA scientists:

Are you also aware that the innovator changed their manufacturing site and had a formulation change several years ago? BE [bioequivalence] was determined in a study that compared the metabolites not the parent compound. Would the current formulation be bioequivalent to the old formulation using selegiline levels?

(A.R. I at Ex. 23)

On February 9, 1996, Dr. Henderson made a presentation to the OGD in which he reviewed the information submitted by Somerset. He commented extensively on the issues raised by Dr. Benet and pointed out problems with the potential application, in the regulatory arena, of the findings of Dr. Mahmood in his Ph.D. thesis. (A.R. I at Ex. 17) Dr. Henderson noted that Dr. Mahmood's study tested selegiline levels in only five subjects (A.R. I at Ex. 15), and found parent selegiline levels to be measurable for a maximum of six hours, and that long in only one subject. (A.R. I at Ex. 17) Dr. Henderson expressed the opinion that the real issue was the possibility that fluctuations in the parent drug would produce a cheese effect. He noted that there had been no reported cheese

reactions at the 10 mg per day dosage, and that such an effect was unlikely even in the worst case scenario of parent drug fluctuation outlined by Dr. Benet. (A.R. I at Ex. 17) The FDA denied Somerset's request for a meeting and did not comment on the company's substantive assertions, but requested more detailed analysis and data from Somerset. (A.R. I at 21) Somerset replied with more letters and more data, but the parties do not agree on whether the company submitted the specific data requested by the FDA. (A.R. I at Ex. 25–28, 30)

On May 1, 1996, OGD Director Douglas L. Sporn contacted Somerset in an apparent attempt to clarify what had been requested from Somerset and what had actually been received. Mr. Sporn reiterated the FDA's need to evaluate the requested data before a meeting could take place. (A.R. I at Ex. 31)

A meeting was finally set for June 7, 1996. (A.R. I at Ex. 37) At the meeting, Somerset officers and consultants presented their concerns that metabolite testing alone could not demonstrate bioequivalency; that Somerset had developed assays sensitive enough to detect levels of the parent drug accurately; and that absent statistical analysis of selegiline levels, bioinequivalent generics could produce a "cheese reaction" in patients receiving too much of the parent drug or immobility in those receiving too little. The FDA representatives, in turn, expressed a number of concerns, particularly over the accuracy of Somerset's assay and requested the validation data verifying the test's sensitivity. (A.R. I at Ex. 37) After reviewing the material presented at the meeting, Dr. Henderson submitted a memorandum to Roger Williams, M.D., Deputy Director of the Office of Pharmaceutical Science. (A.R. I. at Ex. 38) Dr. Henderson acknowledged that the parent drug selegiline was the active moiety, but again expressed the opinion that, due to high inter- and intrasubject variability of selegiline levels and the inaccuracy of testing methods, requiring testing of the parent drug levels was not justified. While accepting Somerset's conclusion that versions of the drug with different bioavailability of selegiline would produce comparable metabolite levels, he pointed out that no "cheese effect"

reactions had been reported in patients who experienced "superbioavailability," that is, higher parent selegiline levels due to variations in the drug's formulation. (A.R. I at Ex. 38)

On July 29, 1996, Mr. Sporn communicated to Somerset the FDA's decision not to make substantial changes to the selegiline bioequivalence guidance as Somerset had suggested. (A.R. I at Ex. 39) On August 2, 1996, the FDA informed three manufacturers who had submitted ANDAs for the tablet form of generic selegiline that their applications had been approved. (A.R. III at Ex. 1–3) Plaintiff sued to enjoin the marketing of such generic products, arguing that the FDA's approval of the generic products was arbitrary and capricious in two respects: 1) the FDA did not require the generic manufacturers to conduct "active moiety" testing, which, according to plaintiff, is the most appropriate "bioequivalency testing using the most accurate, sensitive, and reproducible approach . . .;" 2) the FDA did not require the generic manufacturers to market their drugs in capsule form. (D.I.1)

## IV. DISCUSSION

### A. Legal Standard—Preliminary Injunction

When ruling on a motion for a preliminary injunction, the court must consider four factors: 1) the likelihood of success on the merits; 2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; 3) the extent to which the defendant will suffer irreparable harm if the requested relief is granted; and 4) the public interest. *Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995). All four factors should favor preliminary relief before an injunction issues. *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992).

### B. Likelihood of Success on the Merits

Plaintiff's challenge to the FDA's decision proceeds under the Administrative Procedures Act, 5 U.S.C. § 706, which provides that a court shall not set aside an agency action, findings, or conclusions unless the same are found by the court "to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Under this standard, the reviewing court is empowered only to "consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," not to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Moreover, the FDA is to be accorded deference when it is evaluating scientific data within its technical expertise, *Federal Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 643–44, 30 L.Ed.2d 600 (1972); *Schering Corp. v. FDA,* 51 F.3d 390, 399 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995), as well as when it is interpreting its own regulations, *United States v. Rutherford,* 442 U.S. 544, 553, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979).

Plaintiff claims that the FDA erred 1) in its decision not to require ANDA sponsors to perform statistical analyses of parent selegiline in order to demonstrate bioequivalence; and 2) in its determination that Somerset did not withdraw Eldepryl tablets for safety or effectiveness reasons. According to plaintiff, these decisions are both "outside the law" and "arbitrary and capricious."

### 1. Safety/Effectiveness of Tablet

■ Plaintiff is not likely to succeed on the merits of its claim that the FDA erred in its judgment that Somerset did not withdraw Eldepryl tablets from the market for safety or effectiveness reasons. Defendants maintain, and plaintiff does not dispute, that this determination falls within the agency's discretion. Thus, plaintiff cannot prevail on the merits absent a finding that the FDA's decision was arbitrary and capricious. It is unlikely that plaintiff could meet this requirement. As pointed out by Dr. Woodcock in her review of the citizen petitions, the problems of confusion with counterfeit drugs or with enalapril are not likely to occur with generic tablets. (A.R. II at Ex. 14–15) Dr. Woodcock apparently arrived at this assessment of the risks posed by the production and sale of generic selegiline tablets after careful review, and her conclusions appear quite reasonable in light of the available data. The court concludes, therefore, that plaintiff is not likely to succeed on the merits of its claim that this decision was arbitrarily or capriciously taken, and will not, therefore, grant a preliminary injunction on that basis.

### 2. Metabolite vs. Parent Drug Analysis

■ Somerset argues that the FDA acted outside the law in failing to adhere to 21 U.S.C. § 355(j)(3)(F), which prohibits the approval of a drug where the data submitted in the application "is insufficient to show that the drug is bioequivalent to the listed drug referenced to in the application." Plaintiff also contends that the FDA failed to adhere to its own regulations requiring the use of "the most accurate, sensitive, and reproducible approach available" to establish bioequivalence, a regulation, plaintiff argues, which gives no discretion to the FDA. 21 C.F.R. § 320.24(a). What plaintiff fails to acknowledge, however, is that the determination of **which** method is the most "accurate, sensitive, and reproducible" for measuring bioequivalence is a matter of scientific judgment, falling squarely within the FDA's discretion. After considering the available data, discussing the matter within OGD, between divisions, and with Somerset itself, the FDA concluded that the assay proffered by Somerset was not useful from a regulatory point of view. The court may not substitute its scientific judgment for that of the FDA. Plaintiff may obtain preliminary injunctive relief only if it appears likely that the FDA's decision to rely on metabolite testing as the most accurate, sensititve, and reproducible indicator of the bioavailability of selegiline was arbitrary and capricious.

Plaintiff argues that the FDA did act arbitrarily and capriciously in failing to require parent selegiline analysis after finding a parent drug assay validated in connection with the capsule NDA. Defendants do not dispute plaintiff's contention that selegiline is the active moiety. It is also undisputed that Dr. Mahmood, in reviewing Somerset's NDA for capsule selegiline, concluded that the assay used in connection with that application was validated. Defendants contend, howev-

er, that a subsequent study, the one submitted to the OGD for the purpose of demonstrating the inaccuracy of metabolite testing in determining bioequivalence, called into question the accuracy and reproducibility of the first assay. In considering the feasibility of requiring statistical analysis of selegiline from ANDA sponsors, Dr. Henderson reviewed this newer study as well as the data evaluated by Dr. Mahmood in connection with the capsule NDA. He noted that even in the previous study, parent selegiline was measurable for only two hours in one subject, three hours in another two subjects, four hours in one subject, and six hours in the last. (A.R. I at Ex. 17) After another extensive review of the available data, in May 1996, Dr. Henderson concluded that plaintiff had not adequately backed up its claims of the selegiline assay's accuracy, and in fact "the analytical method appears to demonstrate poor precision for selegiline at the limit of quantitation (LOQ) of 10 pg/ml." (A.R. I at Ex. 32) Moreover, Dr. Henderson found support in Somerset's own submissions, albeit contradicted by other statements made by Somerset, for the importance of the metabolites as indicators of bioequivalence. (A.R. I at Ex. 32) Metabolites had been used by FDA as indicators of bioequivalence before anyone claimed that parent selegiline could be measured, and in fact Somerset's own product, after the company changed the formulation and manufacturing site, was approved on the basis of metabolite testing alone. (A.R. I at Ex. 12, 17, 23, 30) [6]

Plaintiff argues that the capsule/tablet test approved by the NDD and the later solution/tablet test with which Dr. Henderson found fault were submitted for different purposes, involved two completely different methodologies, and utilized different statistical models. Defendants, Somerset contends, cannot invalidate the first, validated test simply on the basis of the second. Whether the results of the second test cast doubt on the methodology employed in the first is, in the court's opinion, a matter of scientific judgment within the discretion of the FDA. In making this decision, Dr. Henderson clearly conducted a thorough review of the available

data, consulted with other members of the OGD as well as the NDD, and re-evaluated the results of the tests which Somerset had brought to the FDA's attention. Whether his conclusion was scientifically correct is not a matter within the purview of this court; the issue here is whether, in light of the administrative record, plaintiff is likely to demonstrate arbitrary and capricious decisionmaking on the part of the FDA. Considering the care with which this decision was apparently made, it does not seem likely that plaintiff will succeed on the merits. Moreover, the court recognizes that despite the NDD's acceptance of Somerset's data on parent drug levels in connection with the capsule NDA, there is a distinction to be made between the decision to *accept* such data from Somerset and the decision to *require* it of the ANDA sponsors. The approval of Somerset's NDA did not depend on the FDA's assessment of the selegiline assay. By providing statistical analyses of the metabolites as well as the parent drug, Somerset met the same standard that was later required for approval of the generics. Accepting additional information not required by the guidance involves a different organizational process, and requires less scrutiny of the information itself, than a decision to require the same information from generic manufacturers. The court, therefore, concludes that plaintiff has not established the likelihood of success on the merits.

### C. Irreparable Harm to Plaintiff

█ In denying plaintiff's motion for a temporary restraining order, this court concluded that the potential harm to plaintiff in denying relief was merely economic, and thus did not justify granting injunctive relief. (D.I.21) Plaintiff now argues that it will suffer irreparable harm to its reputation if patients are injured by bioinequivalent generics which are mistaken for Eldepryl. Such damage to its reputation, Somerset argues, will cost the company its customer and physician goodwill. While it is true that loss of reputation and goodwill can constitute irreparable harm, *Opticians Association v. Independent*

---

6. If, as Somerset argues, metabolites are useless in determining bioequivalence, there is no indication that its own products are bioequivalent to that originally approved by the FDA.

*Opticians,* 920 F.2d 187, 195–96 (3d Cir. 1990), the court cannot accept that such a loss is likely in this case. Plaintiff has offered little more than a bare assertion that patients and physicians will confuse generic selegiline with Somerset's product.[7] Particularly in light of the fact that Somerset now produces Eldepryl only in capsule form while the ANDAs seek approval for a tablet form of the drug, such widespread confusion seems highly unlikely. If some confusion were to occur, plaintiff has the tools that any manufacturer would have at its disposal to establish its product uniquely in the minds of consumers and their doctors. The court concludes, therefore, that Somerset stands to suffer, at most, only economic harm. This factor does not favor injunctive relief.

### D. Irreparable Harm to Defendants

Defendants do not claim that they will be irreparably harmed if the court grants the relief requested by plaintiff. Nevertheless, in the absence of other factors weighing in favor of an injunction, the court does not see fit to second-guess the FDA's scientific judgment or to interfere with the process by which the OGD fulfills its mandate to make safe, affordable generic drugs available to the public.

### E. Public Interest

 As of the time the FDA issued its guidance, defendants maintain, and plaintiff does not dispute, that no "cheese reaction" had been reported in a patient taking 10 mg per day of selegiline.[8] According to the review conducted by Dr. Henderson, a dosage of 1.8 to 2.4 times the norm would be required to approach the level at which selegiline loses its selectivity for MAO B. (A.R. I at Ex. 17) Nonselective MAO inhibitors such as tranylcypromine, isocarboxazid, and phenelezine sulfate have been on the market for some time, and have been prescribed safely for the treatment of depression. The possible side effects of these nonselective MAOIs are well-known, and are referred to in the package labeling for the approved generic selegiline tablets. (A.R.III)

In addition, as noted in the court's previous order, selegiline is to be prescribed by physicians, who are well aware of the potential dangers of over- or underdosage. The package labeling for each of the three approved generics contraindicates nonselective MAO inhibitors, warns of the possible need to reduce levodopa dosage, and includes an extensive discussion of the "cheese effect." (A.R.III) Based on the record, the court concludes that plaintiff has not demonstrated a threat to public safety or other harm to the public interest which would result from this court's denial of plaintiff's motion.

## V. CONCLUSION

As plaintiff has failed to establish the elements necessary for obtaining preliminary injunctive relief, its motion for a preliminary injunction will be denied. An appropriate order shall issue.

---

**7.** Plaintiff has submitted an affidavit in which one instance of a possible confusion between plaintiff's product and a generic version of selegiline is noted. (D.I. 72 at ¶ 11(v)) The court declines to find, based on a single, ambiguous incident, that Somerset's reputation is at stake.

**8.** The package inserts for generic selegiline refer to a single incident of hypertensive crisis in a patient taking selegiline hydrochloride and another drug, ephedrine. (A.R.III) Plaintiff also contends that several "adverse medical events" have transpired as a result of the higher bioavailability of selegiline in the approved generic versions of the drug. These events include a return of Parkinson's symptoms, an episode of hypertension, and stomach upset. (D.I. 72 at ¶ 11) Even if the court were to consider these incidents in determining the likelihood of harm to the public, there is no indication that they are statistically significant. Recognizing the possibility of adverse incidents with any drug, and aware of the likelihood that some patients will have difficulty adjusting to a generic or will prefer one manufacturer's product to another, the court declines to find harm to the public interest based on mere anecdotal evidence.